UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| LAURIE TARDIFF, )<br>)<br>      Plaintiff )<br>)<br>v. )<br>)<br>KNOX COUNTY, )<br>)<br>      Defendant ) | Civil No. 07-10-P-H |

DECISION AND ORDER ON SUMMARY JUDGMENT PART II:
GRANTING PARTIAL SUMMARY JUDGMENT TO THE
PLAINTIFF AS TO LIABILITY ON HER SECTION 1983 CLAIM
AND DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff has sued Knox County under 42 U.S.C. § 1983 for what she claims was an unconstitutional strip and visual body cavity search conducted at the Knox County Jail in 2001. At the time, she had been arrested on a charge of witness tampering, a felony under the Maine Criminal Code.

The principal issues raised by these cross-motions for summary judgment on the merits of the § 1983 claim are whether Knox County Jail personnel had individualized reasonable suspicion for this search; or whether it occurred merely because County policy in 2001 required a strip and visual body cavity search of every arrestee charged with a felony who would not make bail; and, if the latter, whether that policy was unconstitutional. I conclude that the undisputed facts on the summary judgment record demonstrate that Jail personnel had no individualized reasonable suspicion for this search and that under First Circuit precedents Knox County's blanket search policy in

2001 for all unbailed felony arrestees was unconstitutional as applied to this plaintiff. I therefore **GRANT** partial summary judgment to the plaintiff on her § 1983 liability claim against Knox County. I **DENY** Knox County's motion for summary judgment. Damages remain to be determined.

### FACTUAL BACKGROUND

Rockland District Court issued an arrest warrant for the plaintiff Laurie L. Tardiff ("Tardiff") on the charge "Tampering with a Witness," a class C crime (felony) under the Maine Criminal Code, 17-A M.R.S.A. § 454(1)(A)(2). See Pl. Laurie L. Tardiff's Statement of Material Facts, Ex. D ("Pl.'s SMF") (Docket Item 105).[1]  Tardiff was arrested at her home. Pl.'s SMF ¶ 1; Def.'s SMF ¶ 1. Before leaving her home, Tardiff emptied her pockets in front of the arresting officer. Pl.'s SMF ¶ 5; Def.'s SMF ¶ 5. Upon arriving at the Knox County Jail, she was patted down. Pl.'s SMF ¶ 6; Def.'s SMF ¶ 6.

A superior at Knox County Jail instructed female Corrections Officer Linda C. Simmons ("Simmons") to conduct a strip and visual body cavity search of Tardiff. Pl.'s SMF ¶ 8; Def.'s SMF ¶ 8. At that time (February 2001), Knox County Jail had a written policy that required a strip and visual body cavity search for all arrestees who would be unable to make bail, whenever

---

[1] Ultimately, Tardiff apparently was also charged with violating conditions of release, although the record provides no details regarding the reason for this charge. Def.'s Response to Statement of Facts and Statement of Additional Facts ¶ 75 ("Def.'s SMF") (Docket Item 121); Pl.'s Response to Def.'s Response SMF ¶ 75 ("Pl.'s Response SMF") (Docket Item 144). Corrections Officer Linda C. Simmons refers to it by affidavit, Aff. of Linda C. Simmons, ¶ 15 ("Simmons Aff.") (Docket Item 128-3), but the log cited by Knox County only mentions the charge of witness tampering, see Def.'s SMF, Ex. 2, Entry for 17:10, and the arrest warrant contains only the witness tampering charge. See Pl.'s SMF, Ex. D. Nevertheless, Tardiff does not dispute this fact, see Pl.'s Response SMF ¶ 75, and I accept it as undisputed. The significance of this additional charge is that it prevented Tardiff from being eligible for bail set by a bail commissioner and required her to spend the night at Knox County Jail. Def.'s SMF ¶ 76.

2

there was reasonable suspicion that they were concealing contraband such as weapons or drugs, or whenever they were *felony* arrestees. Def.'s SMF ¶ 88; Pl.'s Response SMF ¶ 88 (Relevant portions of the policy are reproduced in Attachment A (the "Policy")).[2] As described by the Policy, a Knox County "strip search" is an unclothed search during which the body surfaces and cavities are visually inspected (often described in the caselaw as a "strip and visual body cavity search"). Simmons took Tardiff to a shower area and ordered her to disrobe, squat and cough three times, exposing her vaginal area and anal cavity.[3] Pl.'s SMF ¶¶ 9–10; Def.'s SMF ¶¶ 9–10. No contraband was discovered. Pl.'s SMF ¶ 12; Def.'s SMF ¶ 12.

Tardiff was held overnight and released the next day. Def.'s SMF ¶ 78; Pl.'s Response SMF ¶ 78. During her detention, Tardiff remained in a cell separate from the Jail's general population. Pl.'s Resp. SMF ¶ 78.

## PROCEDURAL BACKGROUND

On July 29, 2008, I granted in part and denied in part Tardiff's request for summary judgment on arguments that a previous class action controlled the outcome of this case. What remains on the parties' cross-motions for

---

[2] The Policy was referred to, but not submitted, as part of the initial summary judgment record. When I inquired about the omission, the parties submitted the Policy by stipulation on August 6, 2008. Letter from Paul F. Macri, counsel for plaintiff Laurie L. Tardiff, Exs. A & B (Docket Item 151).

[3] Knox County states that Simmons "did not look at Ms. Tardiff's vaginal area and/or anal cavity. While Ms. Tardiff was squatting and coughing, [Simmons] was looking at the floor." Def.'s SMF ¶ 10. But the Knox County policy defines a strip search as visual inspection of body cavities. Attachment A, Policy D-220, Procedure C, Definition. The adjustment in Simmons' gaze is immaterial to my analysis. The fact that Tardiff was required to "squat and cough three times" is considered undisputed because Knox County did not deny it in its responding statement of material facts. Pl.'s SMF ¶ 10; Def.'s SMF ¶ 10. I note that the affidavit of Simmons does contradict the number of times that this part of the procedure was repeated, stating that it was performed only *one* time. See Simmons Aff. ¶ 15.

summary judgment is the constitutionality of the search and of the Jail's search policy.

## ANALYSIS

Knox County devotes by far the greatest part of its legal argument to two primary assertions: "(1) Plaintiff does not have a cognizable Fourth Amendment privacy right on the facts of this case, and (2) even if she did, that right is limited or entirely circumscribed by a jail regulation which is rationally related to a valid penalogical and/or governmental interest." Def.'s Mot. for Summ. J. at 1, n.1 (Docket Item 139).

Knox County's first argument, that Tardiff had no cognizable Fourth Amendment rights, cannot succeed at this trial court level. The First Circuit has held clearly that "convicted prisoners *and pretrial detainees* retain constitutional rights despite their incarceration, including basic Fourth Amendment rights against unreasonable searches and seizures." Roberts v. Rhode Island, 239 F.3d 107, 109 (1st Cir. 2001) (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)) (emphasis added); Swain v. Spinney, 117 F.3d 1, 5 (1st Cir. 1997). I follow First Circuit precedents.

Knox County's second argument also seeks a change in First Circuit caselaw. It argues that I should apply the constitutional "rational basis" test from Turner v. Safley, 482 U.S. 78 (1987), a case involving prison regulations restricting mail correspondence among inmates and prohibiting inmates from marrying. But Turner did not address prison regulations that affect Fourth Amendment rights. I therefore follow First Circuit precedents concerning arrestee searches, precedents that are later than Turner.

4

### *(1) The First Circuit Standard*

To determine whether a strip and visual body cavity search violates the Fourth Amendment in a detention setting, the First Circuit uses the balancing test that the Supreme Court articulated in Bell v. Wolfish:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559; Roberts, 239 F.3d 110–113; Swain, 117 F.3d at 6–7. Applying Wolfish, the First Circuit has concluded that corrections officers must have a "reasonable suspicion" that an arrestee is concealing contraband or weapons before they can conduct a strip and visual body cavity search of that arrestee, "at least in the context of prisoners held in local jails for minor offenses." Roberts, 239 F.3d at 110 (describing the holding of Swain).

In Swain, a strip and visual body cavity search was performed in a local police station on an arrestee held on suspicion of shoplifting and possession of marijuana. 117 F.3d at 2–5. Using the Wolfish balancing test, the First Circuit emphasized the "severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities." Id. at 6 (quoting Arruda v. Fair, 710 F.2d 886, 887 (1st Cir. 1983)).[4] On the other side

---

[4] The First Circuit says that its language "has not been as strident as that of the Seventh Circuit," referring to Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983) ("demeaning, dehumanizing, undignified . . . embarrassing [and] repulsive"), but that it considers "such searches an 'extreme intrusion' on personal privacy and 'an offense to the dignity of the individual.'" Roberts, 239 F.3d at 110 (quoting Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996)).

5

of the balance in Swain, the First Circuit noted that "[t]here was no risk that [the arrestee] would come into contact with other prisoners, or be able to smuggle contraband or weapons into a secure environment." 117 F.3d at 8. The First Circuit concluded in Swain, therefore, that for local jails and minor offenses, "strip and visual body cavity searches [of an arrestee] must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." Id. at 7.

About four years later, the First Circuit assessed the reasonable suspicion standard in the context of more serious institutional security concerns. In Roberts, an arrestee was taken into custody pursuant to an "outstanding body attachment" issued by a family court, apparently for a failure to appear for a judicial proceeding, a misdemeanor. 239 F.3d at 108 & n.2, 112. He then was held at a "maximum security" Rhode Island facility that had a "lengthy history of contraband problems," where arrestees intermingled freely with the general prison population. See id. at 112. Upon arrival, a strip and visual body cavity search was performed on the arrestee pursuant to a blanket policy that required such a search of every person brought to the facility. Id. at 108–09 & n.3.

Applying the Wolfish balancing test in Roberts, the First Circuit recognized that sometimes institutional security concerns "may provide a compelling reason for a warrantless strip search absent reasonable suspicion of *individual* wrongdoing." Id. at 110–11 (emphasis added). Intermingling arrestees with the general prison population presented a "serious security concern that weighs in favor of the reasonableness, and constitutionality, of the

6

search," but alone was not dispositive. Id. at 112–13. Instead, in considering other factors related to security, the court distinguished the security threat that an arrestee presents upon initial detention from that posed by detainees after "contact with outside visitors":

> Although [detained arrestees] certainly have the opportunity to introduce contraband to the prison, and may have even done so in the past, it is far less likely that smuggling of contraband will occur subsequent to an arrest (when the detainee is normally in handcuffed custody) than during a contact visit that may have been arranged solely for the purpose of introducing contraband to the prison population. Furthermore, after an arrest the . . . authorities should be able to detect contraband on the person of a detainee without the need for a body cavity inspection. In addition, the deterrent rationale for the [Wolfish] search is simply less relevant given the essentially unplanned nature of an arrest and subsequent incarceration.

Id. at 111. The First Circuit did recognize that "a policy of searching all inmates is more reasonable when the record indicates a 'lengthy history of contraband problems.'" Id. at 112 (quoting Arruda, 710 F.2d at 887). Analyzing the Rhode Island facility's evidence of past contraband problems, however, the court found the history unconvincing because in many of the past instances "a body cavity search was . . . entirely unnecessary to discover that contraband . . . . [T]he record indicates that less invasive (and less constitutionally problematic) searches would have been equally as effective in revealing contraband." Id. at 112.

Weighing all the factors, the First Circuit concluded that they did not justify departing from the individualized reasonable suspicion requirement and found the Rhode Island search policy unconstitutional under the Fourth Amendment. Id. at 113. But of particular note for Tardiff's claim, Roberts

7

stated in dicta: "[C]ourts have given prisons latitude to premise searches on the *type* of crime for which an inmate is convicted or arrested. The reasonable suspicion standard may be met simply by the fact that the inmate was charged with a *violent* felony." Id. at 112 (emphasis added).

The nature of the charge against Tardiff—a felony—distinguishes this case from Swain and Roberts, both of which involved misdemeanors. The First Circuit has not addressed directly whether its individualized reasonable suspicion standard applies to felony arrestees. But as a trial court judge, I must take into account the Roberts dictum: "[t]he reasonable suspicion standard may be met simply by the fact that the inmate was charged with a *violent* felony." Id. (emphasis added). That statement implies that the reasonable suspicion standard *does* apply to arrestees charged with a felony, and that a *violent* felony charge alone could supply the reasonable suspicion, but that *non*violent felony charges may require something more individualized. Judge Carter of this District interpreted the First Circuit precedents on this question and concluded:

> While the First Circuit has not directly addressed the appropriate test for the validity of a strip search during the booking process at a local jail and incident to a felony arrest, this Court concludes that, with respect to detainees charged with a *non-violent, non-weapon, non-drug* felony, the particularized reasonable suspicion test is applicable, rather than strip searches of all felony arrestees being authorized based solely on the fact that they had been arrested on a charge categorized under state law as a felony. . . . The distinction between felony and misdemeanor detainees alone fails to address the likelihood that a detainee would be concealing drugs, weapons, or other contraband.

8

Tardiff v. Knox County, 397 F. Supp. 2d 115, 130 (D. Me. 2005) (emphasis added). Likewise, Judge Gertner of the District of Massachusetts concluded that a policy requiring strip and visual body cavity searches for all felony arrestees was facially unconstitutional, reasoning that the "felony-misdemeanor distinction . . . offers little information about the likelihood that an individual arrestee is concealing weapons or contraband." Ford v. City of Boston, 154 F. Supp. 2d 131, 143 (D. Mass. 2001). I agree with the analysis of Judges Carter and Gertner: under First Circuit precedents, felony categorization alone does not obviate the requirement of individualized reasonable suspicion for a strip and visual body cavity search of an arrestee.

Here, the felony charge against Tardiff does not satisfy the Roberts dictum because it was not a violent felony. Witness tampering under Maine law can be violent, but Tardiff was not charged under the provision of the statute that specifically accounts for violence. Instead, she was charged under a subsection that does not require proof of violence. Compare 17-A M.R.S.A. § 454(1)(A)(2) (the charge against Tardiff) with § 454(1)(B).[5] Obviously, witness

---

[5] At the time of the relevant events (February 2001), the Maine Criminal Code contained three distinct charges for tampering with a witness: "A person is guilty of tampering with a witness, informant or victim if, believing that an official proceeding, as defined in section 451, subsection 5, paragraph A, or an official criminal investigation is pending or will be instituted, that person:
    A. Induces or otherwise causes, or attempts to induce or cause, a witness, informant or victim:
        (1) To testify or inform falsely; or
        (2) To withhold any testimony, information or evidence;
    B. Uses force, violence or intimidation, or promises, offers or gives any pecuniary benefit with the intent to induce a witness, informant or victim:
        (1) To withhold any testimony, information or evidence;
        (2) To refrain from attending any criminal proceeding or criminal investigation; or
        (3) To refrain from attending any other proceeding or

*(continued on next page)*

tampering can be committed with or without involvement of, consideration of, or reference to violence, weapons, drugs, or other contraband. Nothing in the charge against Tardiff suggests that the charge against her was associated with physical violence, weapons, drugs, or other types of contraband that would justify a strip and visual body cavity search. As a result, it does not satisfy the Roberts dictum that a violent felony charge alone may supply reasonable suspicion. (The charge against Tardiff also did not involve weapons, drugs, or other kinds of contraband.)

The potential security concerns related to Tardiff's detention were less severe than those in Roberts (there, a maximum security facility where arrestees intermingled with the general population of convicted inmates; here, a county jail where Tardiff was kept separate from the general inmate population).[6] The prior history of contraband problems at Knox County Jail in 2001 also shows that a strip and visual body cavity search was rarely necessary to uncover contraband.[7]

---

        investigation to which the witness, informant or victim has
        been summoned by legal process; or
  C. Solicits, accepts or agrees to accept any pecuniary benefit for
  doing any of the things specified in paragraph A, subparagraph
  (1), or in paragraph B, subparagraph (1), (2) or (3).

17-A M.R.S.A. § 454(1) (2001).

[6] Other female pretrial arrestees could have been placed in the cell with Tardiff during her overnight stay. This potential of limited contact with other arrestees does not present the same security concerns as when an arrestee interacts directly with the general population of inmates. Security concerns related to the intermingling of arrestees alone can be addressed by the reasonable suspicion standard for a strip and visual body cavity search at the time of initial detention.

[7] Knox County has provided reports of approximately seventy-five examples of contraband discovered at its facility between July 1998 and March 2008. See Def.'s SMF ¶¶ 97–148. Tardiff was searched in February 2001, and Knox County offers no explanation why evidence of contraband discovered after that date should support its decision to have the Policy in 2001. Moreover, most of the incidents are irrelevant to the question of whether a strip and visual body cavity search of an arrestee was necessary—for example: cigarettes found in letters
*(continued on next page)*

These factors—the nature of the felony charge against Tardiff, the extent of Tardiff's potential contact with inmates or other detainees, and the history of contraband at Knox County Jail in 2001—balanced against the "severe if not gross interference with a person's privacy" that this type of search entails do not justify deviating from the First Circuit's requirement that individualized reasonable suspicion support performance of a strip and visual body cavity search.[8]

*(2)  Applying the Individualized Reasonable Suspicion Standard*

I turn therefore to whether Jail personnel conducted the Tardiff search because of any individualized reasonable suspicion, an independent ground under the Knox County Policy.  In its summary judgment papers, Knox County suggests four alternatives that could have caused the search:  the elements of the felony charge itself; Tardiff's ineligibility for bail, requiring her to spend the night at Knox County Jail; the facts supporting the arrest warrant; and Tardiff's conduct at the Knox County Jail before the search.

Beyond the Policy itself, the only record evidence regarding the reason for the Tardiff search comes from Simmons, the officer who performed the search.

---

received by inmates; drugs discovered during cell shakedowns; various items of contraband found in inmate clothing.  Of the approximately seventy-five examples, only three arguably required a visual body cavity search to reveal them.  Those three examples involved: marijuana hidden behind a pretrial detainee's scrotum, id. ¶ 102; a syringe hidden in an inmate's rectum, id. ¶ 119; and a $1 bill between the legs and a pill hidden in the rectum of a pretrial detainee, id. ¶ 144.  Only the first of these examples occurred before the Tardiff search.  From the reports produced by Knox County, it is not possible to determine whether reasonable individualized suspicion existed in any of these instances.  Furthermore, Knox County has provided no information regarding the total number of inmates, detainees, and searches conducted at Knox County Jail yielding its seventy-five examples.

[8] The expert affidavit and report of Thomas Rosazza submitted by Knox County,  see Affidavit of Thomas Rosazza (Docket Item 125); Expert Report of Thomas A. Rosazza, Def.'s SMF, Ex. 5, are not grounds for failing to follow the First Circuit caselaw.  I do not rely on his legal analysis.

11

Simmons' affidavit states that the reason for the search was that Tardiff was charged with a "felony involving violence" and would be staying overnight because she could not make bail.[9] Def.'s SMF ¶ 77; Pl.'s Response SMF ¶ 77; Simmons Aff. ¶ 6. Simmons testified also that she believed that *any* witness tampering was, by definition, a violent felony. Simmons Dep. at 57. In fact, the charge against Tardiff was not a violent felony, as I have explained above.[10] Simmons' deposition confirms that there were no other reasons for the search:

> Q: [Your superior] would be the one making the decision as to whether or not somebody's [criminal] charge was the kind of charge that permitted, under the policies and procedures of Knox County, a strip search?
> A: That is correct.
> Q: Okay. Now, did you understand that the reason that you strip-searched Laurie Tardiff was because she had been charged with a violent felony?
> A: Yes.
> Q: And that was the only reason that you were strip-searching her?
> A: Yes, and that she would be staying over.
> Q: Okay. So the fact that she was going to be staying over and that she was charged with a violent felony, those are the only reasons that she was being strip searched, correct?
> A: That's correct.

Simmons Dep. at 21. Knox County has not provided any affidavit or testimony from her superior officer that would contradict Simmons' understanding as to why she was ordered to perform the Tardiff search. According to the summary

---

[9] Simmons also testified that her understanding of the Knox County Policy was that such a search was to be conducted even if the charge was only a misdemeanor. Dep. of Linda C. Simmons, at 58, 67–68. The single factor that provoked a strip and body cavity search at the jail, according to Simmons, was the fact that the arrestee would be staying overnight. Id. at 68.

[10] Because the lawsuit is against the County and based upon a County policy, I need not be concerned with qualified immunity and the reasonableness, if any, of Simmons' mistaken understanding. A local government may not avoid § 1983 liability based on a defense that its employees acted in good faith. See Owen v. City of Independence, 445 U.S. 622, 650–52 (1980).

judgment record, therefore, the search occurred merely because Tardiff would be staying overnight and was charged with a witness tampering felony, a charge that in Simmons' mind always involves violence.

With that background, I address each of Knox County's four alternatives.

(1) I recognized above the <u>Roberts</u> dictum that "reasonable suspicion" may exist based solely on the charge of a "violent felony," <u>Roberts</u>, 239 F.3d at 112, and explained why the nature of the charge against Tardiff (not a violent felony) does not itself supply individualized reasonable suspicion for the search.

(2) The fact that Tardiff was ineligible for bail set by a bail commissioner, and thus had to spend the night at Knox County Jail to wait for an appearance before a judge the next day, has no bearing on the existence of an individualized reasonable suspicion that she was concealing contraband or weapons. Moreover, given the nature of her detention (segregated from the general jail population), spending the night does not implicate sufficiently serious security concerns to affect the balancing test under <u>Wolfish</u> as applied in <u>Roberts</u>.

(3) The underlying facts of a particular crime could provide individualized reasonable suspicion, but Knox County has not shown that they did so here. Knox County has provided the detective's affidavit in support of the arrest warrant and the witness statements to the detective supporting that affidavit. Even if these documents supported an individualized suspicion of violence that might buttress a concern for concealed weapons (a great stretch

13

given the vagueness of the detective and witness statements),[11] Knox County has provided no evidence (including the affidavit and ninety-nine page deposition of Simmons, the officer conducting the search) that Simmons, her superior, or anyone else at the Knox County Jail ever read the affidavit or the witness statements.

(4)   Finally, Knox County refers to Tardiff's behavior upon arrival at Knox County Jail as potentially providing reasonable suspicion. See Def.'s SMF ¶ 13.[12]   This is an attempt at after-the-fact justification rather than identifying the actual reason for the search. Simmons nowhere mentions Tardiff's conduct at intake as a reason for her search. She identified explicitly at her deposition the "only" reasons for the search. This was not one of them. The record therefore cannot support an inference that Tardiff's behavior at intake was a cause of her search.

Therefore, I conclude that the summary judgment record demonstrates that Knox County Jail personnel had no individualized reasonable suspicion that Tardiff was hiding weapons, drugs or other contraband. Officer Simmons

---

[11] According to the detective's affidavit requesting the warrant, Belle Bosworth told him that "she had been approached and called numerous times by Laurie Tardiff in regards to not being involved with a case that resulted in Tardiff's arrest on 1/18/01." Def.'s SMF ¶ 73; Pl.'s Response SMF ¶ 73; Aff. of Michael Middaugh, ¶ 3 & Attached Exs. ("Middaugh Aff.") (Docket Item 128). Belle Bosworth's personal statement attached to the request for the arrest warrant stated:
> Laurie [Tardiff] stated you . . . don't know what I'm capab[le] of as she lean very close to my face. . . . Laurie stated can't you understand me. I said yes and left.
> When she first started talking to me she was very angry. And as the conversation went on she got very close to me then . . . is leaning into my face

Witness/Victim Statement of Belle Bosworth, attached to Middaugh Aff.

[12] This involved some disagreement over the appropriateness of the blouse that Tardiff was wearing and her resistance to being told to put on a jail sweatshirt before she could enter the jail. After that incident, Simmons remembered Tardiff as "being very cooperative" during the booking process. See Simmons Dep. at 61.

searched her solely because Tardiff was staying at the jail overnight and had been charged with a felony, a felony that did not involve drugs, weapons or violence. Under First Circuit precedents, conducting such a search on account of that policy and those reasons is unconstitutional. I therefore **GRANT** the plaintiff summary judgment on liability. I **DENY** the defendants' motion for summary judgment.[13]

## CONCLUSION

The Clerk's Office shall schedule a conference of counsel to discuss how to proceed on the issue of damages.

**SO ORDERED.**

**DATED THIS 7TH DAY OF AUGUST, 2008**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[13] Knox County's pending motion for leave to file a motion to compel (Docket Item 86) and its related motion for leave to file excess pages (Docket Item 88) are **DISMISSED AS MOOT** for reasons explained in my Decision and Order on Summary Judgment Part I.

**Attachment A**

Policy C-120 ("Admission Procedures – Inmates Not Bailed"):

The following admissions procedures are not required to be completed on inmates being admitted and immediately released. Procedures, as outlined below, are necessary to safely admit inmates who are not going to make bail, while protecting their rights.

PROCEDURE A Strip Search/Decontamination

1. Strip searches will be conducted on pre-trial inmates at the time of arrest or admission to the facility if they are charged or held for murder or a class A, B or C crime[]; they will be conducted only under the following conditions:

   a. They shall be conducted only by, and in the presence of, staff of the same sex as the inmate.

   b. They shall be recorded and include at a minimum:

      (1) Name of inmate.
      (2) Name of staff person doing the search.
      (3) Name of any other persons present.
      (4) Justification for search if required under 5 MRSA, Section 200G.

. . . .

3. Strip searches will <u>NOT</u> be conducted at the time of arrest or admission on pre-trial inmates charged with a class D, E, or other misdemeanor offense unless the officer has <u>REASONABLE SUSPICION</u> to believe that an inmate is concealing contraband and is about to come in contact with other inmates of the facility.

. . . .

Policy D-220 ("Search Procedures"):

Contraband in a correctional facility creates a danger to staff, visitors, and residents. In an effort to stem the flow of contraband, facility shakedowns, searches of common and living areas will be performed, in addition to body searches of inmates in accordance with the Maine State Attorney General's Rules for Searches and the Maine Jail Standards.

Officers must act in a professional manner while performing pat and strip searches and do them in the least degrading manner possible.

16

PROCEDURE A Search Procedures, General

1. Body searches will be performed in the least degrading manner by corrections officers prior to the admission process. The officer performing the search will ensure that:

    a. Pat search all detainees brought into the jail between the 105E and 110E doors *before* the 110E door is opened and they are brought in to Booking.

    b. Strip searches will be conducted only on inmates brought in on felony charge (A, B, or C crime) or if the officer(s) have reasonable suspicion that contraband, i.e., a weapon, drugs, or evidence of a crime may be concealed under their clothing.

    c. All inmates being transported will be pat searched; they may be strip searched if probable cause exists to believe that the safety of the officers, the inmates and/or the public could be in jeopardy.

    d. The following information is recorded in the Daily Log (Shift Activity Log).

        (1) Date, time and location of search.
        (2) Name of the inmate(s).
        (3) Any items seized.
        (4) Name(s) of Officer(s) performing the search.

    e. Incident reports are prepared and submitted if any contraband is found.

    f. Searches are performed by persons of the same gender as the person(s) being searched.

. . . .

PROCEDURE C Inmate Strip Search

DEFINITION: A strip search is any unclothed search during which the inmate's body surfaces and cavities are visually inspected, with the lifting or moving of body parts done by the individual being searched; all clothing items of said individual will also be searched thoroughly in the process. Strip searches will be performed inside the Booking area in the shower stall after a pat search has first been done before admitting the detainee beyond the 110E door.

1. The Intake (Booking) Officer will conduct a strip search of any inmate admitted to the facility who is:

      a.      Charged with murder, or a Class A, B, or C crime and,

      b.      Unable to bail on charges, and,

      c.      Before coming in contact with any other inmate.

      d.      A strip search may also be performed for the safety of the staff and inmate population and security of the facility when probable cause exists to believe that the Inmate in question may be concealing contraband and/or weapons on his/her person and a pat search has not turned up anything.

2.      The strip search must be conducted by an officer of the same sex as the inmate, with the following rules observed:

      a.      Allowing only those officer personnel of the same gender who are necessary to be present during the search for the following reasons:

            (1)      Protection.
            (2)      Witnessing removal of contraband or evidence of a crime.
            (3)      Other legitimate law enforcement purpose.

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (PORTLAND)**
**CIVIL DOCKET FOR CASE #: 2:07CV10 (DBH)**

| | | |
|---|---|---|
| **Laurie Tardiff,**<br><br>  **Plaintiff** | Represented By | **William D. Robitzek**<br>**Paul F. Macri**<br>Berman & Simmons, P.A.<br>P. O. Box 961<br>Lewiston, ME 04243<br>(207) 784-3576<br>email:<br>wrobitzek@bermansimmons.com<br>pmacri@bermansimmons.com |

**v.**

| | | |
|---|---|---|
| **Knox County,**<br><br>  **Defendant** | Represented By | **Peter T. Marchesi**<br>**William Gagne Holmes**<br>Wheeler & Arey, P.A.<br>P. O. Box 376<br>Waterville, ME 04901<br>(207) 873-7771<br>email: pbear@wheelerlegal.com<br>wgh@wheelerlegal.com |